Case number 17-1036. Sandwich Isles Communications, Inc. Petition v. Federal Communications Commission, N.L. Mr. Smith for the petition. Ms. Sitchin for the respondents. And Mr. Price for the intervener. May it please the Court, my name is Lex Smith. I am here on behalf of Sandwich Isles Communications. I have asked to reserve five minutes for rebuttal. In 2005, the Federal Communications Commission issued an order. That order said a number of things about the plan of Sandwich Isles Communications to create a new telecommunication network linking the six main Hawaiian islands. It's found that that plan was in the public interest. So you're talking about the Bureau's order in 2005? That's correct, Your Honor. I apologize. You're talking about the waiver, the study area waiver. That's right, Your Honor. And so what I'm talking about is what they actually, clearly the ordering clause of that order did not say we approve the plan. But I think if you look at that order and you look at what it says, it says it's in the public interest for Sandwich Isles Communications to build this network. It says that Sandwich Isles Communications should receive support for building the network. Where does it say that? It says that Sandwich Isles recently submitted a multimillion dollar broadband loan application to RUS, the federal government, for new construction. It doesn't say they got it. In fact, they didn't get it. Pardon me, it doesn't say what? It doesn't say they got it from RUS. In fact, they didn't. So what I said was they said it's in the public interest for SIC to receive support for the network. What do you mean support? It says that they get a waiver of the existing situation and then go ahead and try and pursue that. But there's nothing whereby the FCC indicates that it is providing the resources or the legal authority to actually operate. That order says that SIC is entitled to support. Where does that say that? Your Honor, I'll find the exact page. I'm reading it right now. I think we're on JA-34. JA-30, I see right here. I don't see anything. The order favors support for Sandwich Isles. It does not, as I said, as I conceded up front, it does not expressly say that this plan is endorsed or supported, but the overall All of the FCC Bureau decides that they will grant a waiver from the existing situation so that Sandwich Isles can pursue their dream. Can receive support. That's right, Your Honor. Where does it say receive support? I apologize. I don't have the police in front of me, but I'll bring it back to you on rebuttal. I don't see anything about receive support. They say you're going to have to make large capital investments, and they say, therefore, it's in the public interest for Sandwich Isles and its customers to benefit from the cost savings and lower rates available for NEPA participation. That's all I see. The purpose of the waiver is so that Sandwich Isles can receive support. The purpose of the waiver could just be to allow Sandwich Isles to continue participating in NECA, which is what this says. And this is, as I understand the chronology, this was issued two years before you undertook the new cable. I suppose that depends on what you say about undertook. We have provided you, we've cited the letter that NECA actually wrote in the year 2000, which indicated that they were fully aware of the plan to build the cable. And that letter expressly said that there should not be a problem receiving support for it. So I think it's a little bit of a distraction or a confusion for NECA to try to tell the court that they first heard about this in 2007, and they didn't have any, and at that point they said, wait a minute. Even if they did know, and even if the association had, even if they had signed off, does that bind, what authority is that for binding either the Bureau or the Commission? Does the association have that ability? I'm not saying that NECA was bound necessarily by that order. What I am saying, though, is that— No, what I'm asking is if the association, if we read the association's decision— Right, or their letter. Letter. In your favor, write it just as you read it. Right. The question here is whether the Commission's decision should be sustained, and does the association have any—I'm trying to figure out the relationship between the association's view and the Commission or the Bureau, going through the Bureau first and then to the Commission. What I'm saying— Does the Commission bind either one? I don't have authority that they're bound by what they say. The statute itself says, the 1996 amendments to the statutes, say that the support that's provided for rural telecommunications is to be specific, sufficient, and predictable. What I'm really suggesting here is that there was a change. Somewhere between 2005 and 2016, there was a change. I submit to you the project was supported in 2005 and before, and it wasn't in 2016. Well, you keep saying supported. Your original waiver request said you were going to get the money from RUS. Yes, Your Honor. But you never got the money from RUS. That's true. It was privately financed. And I must say, as an ex-banker, I am utterly astonished that any bank would have given a loan on this one. Deutsche Bank hired their own cost consultant, looked at the law— No, they have to speak for themselves to whatever regulators they have in Germany. But in any event, there's nothing about the FCC providing support for this. It was supposed to be coming from RUS, the federal government, and the federal government refused. The way the system works, the system that is mandated by the Communications Act, as amended by the 1996 amendments, is that the RUS provides the loans for these things. But the RUS refused. I'm trying to explain. The RUS provides—you're right that the RUS refused. But the funds to service the debt come from the FCC. So in this case— The funds to service the debt come from the FCC? That's correct, Your Honor. The money actually flows from a check from the FCC? I beg your pardon? I don't understand. You're saying the FCC actually provides money for this? Yes, the FCC provides funds called universal service funds. Not for the construction? Correct, to service the debt that was incurred for the construction. Did the FCC ever agree to that? It was NECA that was supposed to do it, which— Ah, you've got me confused. You're right. There are multiple mechanisms under the law for providing universal service. This whole statute exists because the big telecoms, who are all here today, won't service rural areas because it's not economic. So they need subsidies in order to provide the service. And the funds for the service come from a couple of different places. The universal service funds that come from the FCC and NECA. The 2005 order expressly said, you should join NECA because you'll be able to get support for this program through them. So there were funds from NECA as well as universal service funds, which really aren't the subject of this case today. So something happened between 2005 and 2016. You don't dispute the notion that regulated industries must show used and useful tests with respect to expenditures? What I would say about that is that when a company puts in a new cable, they don't put it in for just the amount of capacity they have that day. They need to be able to put in more. You put in a cable, which absolutely astonished me, because it was able to provide service, both telecom and other kinds of service, to everybody in the state of Hawaii in order to reach 2,000 people. That's true under today's standards. At the time of the design, the multiplexing technology has advanced greatly since that time, so that it looks much more outrageous today than it did at the time. But the other point about that is that the incremental expense... I hate to say this, but I agree with you. It is much more outrageous, meaning that it was outrageous at the time. The other point, Your Honor, the incremental expense between putting in, say, a 12-fiber cable and putting in a 48-fiber cable is negligible. I mean, that's... Of course, you could lease. You could lease, as you had, on existing cables. The existing cables are voice quality, not modern quality. They're at the end of their life cycle. Something was going to have to be done on this anyway. Those things were all recognized by the RUS when they originally gave their approval for the law. Hawaii Telephone doesn't operate adequate service? That's correct, Your Honor. Their undersea cables are, as I say, at the end of their life cycle, and the leased lines that they provide are of poor quality. And that was recognized by the RUS approval. Let me ask you another question about your sort of settlement offer, $8.1 million. You don't have any agreement on that, do you? An agreement on... The $8.1 million. We... We had an agreement, but it's not been signed, and that's the reason it was not submitted. You don't have an agreement. Okay, fair enough. We don't have a signed agreement. We did reach a handshake agreement with them. I see that my time is up. I'll hold on for rebuttal. You have a lot of pill to kill. Good morning. May it please the Court, I'm Sarah Citrin for the FCC. This is not a case about the FCC's universal service subsea program. It's a case about what rate payers should pay for the services they purchase, and it's a case that arises from Sandwich Isles' decision to build the largest undersea cable in Hawaii, which, as Judge Silverman said, had the capacity to serve every landline subscriber in the state when Sandwich Isles served less than 1% of those subscribers. And the question for the Court is whether the FCC reasonably determined that Sandwich Isles has not met its burden to justify recovering the full cost of that cable through pooling. Sandwich Isles has challenged the reasonableness of the Commission's decision on two narrow Administrative Procedure Act grounds. It says first that the Commission improperly ignored evidence concerning the renegotiation of its lease costs, which it says it could total in full $8.1 million, and it says that the Commission departed without sufficient explanation from the 2010 declaratory ruling of its subordinate Bureau. In 2000, the Association, NECA, notified Sandwich Isles that, based on information it had received, quote, it is reasonable to assume, this is a JA-148, it is reasonable to assume that Sandwich Isles Communications will receive the estimated NECA settlements throughout the projected period. What do you do with that? I think that that assurance, whatever it meant to NECA at the time, and I'm not entirely sure, but I don't believe that it binds the Commission later. How is it so, I get that, I'm not sure, is that right, that what the Association decides just has no binding impact on the Bureau of Commission? It's an odd relationship. The process, as I understand it, for the costs included in NECA's pool, NECA makes an initial determination and the Commission, they file annual tariffs, which, if challenged, the Commission would review de novo NECA's assessment of the reasonableness of the costs. But that didn't happen here. It happened later. It happened later. AT&T challenged. AT&T challenged? No, what happened actually in this context was not at the time of the filing of a tariff, but Sandwich Isles and NECA had been seeking from 2007 to 2009 to resolve whether these costs were... Who first challenged it? Sandwich Isles brought a petition for declaratory ruling to the Commission. Because NECA was refusing to pay? That's right. So that was in 2009?  2009. So at that point, Sandwich Isles... That's nine years after this letter. That's nine years after this letter. The Paniolo Cable was... The chronology is that Sandwich Isles decided to lease the Paniolo Cable, conceived of and decided to lease the Paniolo Cable in 2007, and that's when it initiated this back-and-forth with NECA, which ultimately led to the petition before the Commission. What do we make of that, this 2000 letter? I don't think it's relevant to the Court's decision today. And, in fact, I don't think the question of reliance at all is the question on which the APA challenges in this case turn. Briefly, as to the 2005 order, because... Well, hang on a second. I mean, their argument is about, hey, we were told we were getting at least 50 percent of this stuff, and then everything changed five or six years later between the Bureau and the Commission, and then so they're told one thing in 2000 and another thing in 2005 and something totally different in 2011. And just to understand how this scheme works, maybe not with respect to this specific case, but capital investments aren't something one can do on little 12-month spurts. And so how are people supposed to... I mean, I think that's what their argument about the unexplained switch is, is, look, we're making a capital investment here. It's a long-term investment. We went to the Association in 2000, got some kind of green light when we made about what they got there, and then in 2005 they got 50 percent, and a decade later, 11 years later, the Commission pulls the plug on the whole thing. But it's a little hard to undo all that capital investment 11 years later. Well, because the Commission wasn't involved in 2000 and with this neck letter, I don't really know. I see what they've quoted, and I understand Samuel Child's understanding of what NECA was representing. I don't know. But what I do know is that... Well, when the Commission doesn't act, by statute, when the Commission does not act, which it didn't do for six years, then the Bureau's orders shall have the same force and effect and shall be made evidence and enforced on the same matter as orders, decisions, reports of the Commission. So what are people supposed to rely on in trying to make capital investments with a scheme like this? They're told to rely on the Bureau. The Commission doesn't act. That's what holds. Six years, they're getting 50 percent, and then someone pulls the rug out from under their feet. So that question, as I understand it, goes to reliance on the 2010 order, and I think there... The cable had been built long before the 2010 order, so it's impossible for a petitioner to argue that it relied on the 2010 order to build the cable. Chronologically, that's right. And furthermore, the 2010 order was immediately appealed. No, but they say the 2000 letter... I'm sorry. Go ahead. What do we know about the cable at the time of this 2000-letter order, whatever it was that Judge Millett's been asking you about? My understanding is they conceived the cable in 2007 and had it built by 2009. Right. Is there anything circa 2000 where they're not just coming in and saying, let us in to NECA, but saying, hey, we want to build this super-duper expanded new cable? No. And my understanding is the first NECA heard of the Paniolo cable was in 2007, but that earlier there may have been discussion with NECA about building a network in Hawaii. I'm a little confused about because there's this 2000 letter, and then in the study area waiver there's certainly a recognition, at least, that they were going to have to make expensive capital investments. So somebody must have thought something was going to happen. Now, maybe it changed, maybe it became ballooned in 2007 or not, but what I found very confusing about this case is I can't figure out the basic who-knew-what-when question, and all we got was, well, don't pay attention to anything the Bureau has said because the Commission gets to review it six years later, and that seemed to me a better, heavier answer to this problem. Well, I think on the 2005 order and what the Commission was looking at there, Judge Katz has understood it correctly, that the Commission understood that Sandwich Isles was thinking to undertake large capital investments and that it was in the public interest to allow Sandwich Isles to participate in the Universal Service Program and to join to be part of the NECA pool, but that was not an assessment of any particular facilities or whether those facilities were used and useful to rate payers, and that didn't come, Judge Silverman, as you've said, until two years later in 2007. I get that, but so what were they thinking when they said, because part of the benefit of NECA is that these small companies can group together because it's really hard for any one of them to bear the capital expenses, and I get the argument that, Lordy, nobody knew it was $24.1 million when that showed up later, but is there anything in the record that tells us what, if there's a finding here that they're going to have to make expensive capital investments that are expensive enough they can't sort of hand it along on their own, they need to join NECA? Is there anything? There's nothing in the record of this case about what, if anything, specifically Sandwich Isles told the Commission in 2005 about the exact nature of its facilities, but what we can be sure of from the chronology is that Sandwich Isles could not have presented the cost of these facilities. Okay, so it didn't say here's the Paniola Cable Plan. What if, just hypothetically, what if, as part of that 2000 letter from the Association and this 2005 study area waiver, when they said we need to be in, we're going to have a lot of expensive capital costs, if they'd given notice that we're talking, we think, somewhere in the range of $15 to $25 million, if that were in the record, wouldn't they be able to rely on that? You know, the notion of reliance that Sandwich Isles is advancing, which, again, I don't really think is one of the legal issues in the case, but I also don't think it can be right in the abstract hypothetical sense because the implication would be that whatever enormous investment was approved at some early stage in time, however useless it turned out to be, and whatever benefit, whatever anticipated benefit did not materialize for rate payers, that they could be on the hook for the cost of those facilities. I think that makes perfect sense. The problem is when the SEC takes six years to act, and you're talking about capital investments, what are people supposed to do? If it's that easy, why does it take six years and reopening the record to answer that question? In this case, Judge Millett, the investment was before any delay by the Commission, and the delay in this case, if anything, benefited Sandwich Isles because the Commission did not claw back those payments. That's not my point. My point is they were told then in 2010 when the Bureau said they could get the 50%, right? And then it was six more years before the Commission said no? I get that they didn't make it retrospective. That would be a much harder case. That's a good answer to reliance. But I'm just trying to understand the scheme and how it's supposed to work if you're a theory of don't rely on what the Bureau did for your capital investments because we can pull the rug out from under you six years later if we get some new facts and decide differently. I'm just asking generically, not even specifically in the context of this case, but how is the system supposed to work? Well, I'm not sure if it would work differently in the situation where someone had challenged the tariff before it went into effect, but I think that delay is a function of the way that the case developed here, which was by this petition for declaratory ruling, and there is no— So if no one had ever challenged this, then you could have just gone on— the Commission or Bureau don't do any independent review. They just start cutting the checks for the $24 million? The tariff, if it is approved in this streamlined process, that's the system. The rate is approved—the tariff is approved on a streamlined basis. I'm a little confused. Did anybody challenge the tariff? No one challenged the tariff. No, it was approved through— The tariff is put in by NECA. That's right, on behalf of not just— It's a nationwide tariff, right? That's correct. Yes. But somebody was challenging the used and useful aspect of this cable. Who was it? Well, NECA was refusing to approve the inclusion of these costs. That's what I thought. And then sandwich files came— That's right. So NECA refused to accept these costs. That's right. And that's why I pushed sandwich files to petition for a declaratory ruling from the FCC in 2010. That's right. Let me just try a different way of getting at Judge Millett's point. The company is contemplating a major capital investment, and let's assume for purposes of the hypothetical it's a close case whether that makes economic sense or not. What are they supposed to do to get the blessing before they invest all of that money? Is it get a declaratory ruling and go all the way through NECA up to the board, up to the FCC? And if they don't do all of that, they proceed at their own risk? That's right. What are they supposed to do if it takes a decade to get through that process? You can't do capital investments that way. Well, they always have recourse, if nothing else, to a petition for mandamus to this court. I don't think here the record shows that sandwich files was complaining about the delay. And as I said, that may be because the delay in this case was an antediluvian benefit. That's right. If there are no further questions, I ask that the petition for review be denied. Thank you. Good morning. May it please the Court, Daniel Fyfe for Intervenor AT&T. May I ask you a question concerning your interest in this case? I was a little confused by the briefs. But if there's a payment to sandwich files, it comes, I thought from the brief, it comes out of the pool. It doesn't increase the total payments into the pool. It comes out of the pool. So, therefore, it's taken from other small carriers all across the country. Let me clarify that for you, Judge Silverman. The cost that sandwich files recovers from the pool affect the overall rates that the pool members charge. And those rates are then passed on to inter-exchange carriers. So, it's not a zero-sum game, whereby if sandwich files gets a certain approval, the total rates go up. It looked, from the briefs, that it was a zero-sum. If sandwich files got it, it came away from the pool and came away from smaller carriers all across the country. I think it's fair to say that it's a zero-sum in two respects. First is the basic respect that any money sandwich files gets is coming out of ratepayers' pockets. But it's also— From the small carriers around the country. From the inter-exchange carriers and the customers of those small carriers around the country. And it's— Inter-exchange or the access? You're talking about the local carriers. The local carrier—the cost that sandwich files recovers from the pool affect the rates that those local carriers charge to ratepayers. So, it's zero-sum— Yes, but I didn't see it affected the rates they charge the inter-state carriers. So, it affects the access—it affects the inter-exchange carriers through the access charges. They actually go up. They actually go up, yes. So, that presents—so, you do have an economic interest. Yes, that's correct. I'd like to turn to the reliance interests that the court was asking about. I wanted to first address the 2000 NECA letter and make two points respecting it. The first is that—and I unfortunately don't have a direct citation to the record on this, but the 2000 letter, in addition to the comments that the court asked about, stated and warned sandwich files that consistent with FCC and NECA rules, sandwich files would still have to, on a going-forward basis, justify its costs annually as NECA requires. And that's consistent with the basic used and useful principle that on an ongoing basis, carriers need to show that the cost that they are recovering from ratepayers are benefiting ratepayers. The second point is that the 2000 letter was by no means NECA's last word on this investment before sandwich files decided to enter it. When sandwich files came to NECA in 2000 before signing the Paniolo lease, NECA warned that the cost— 2000? I'm sorry, 2007. I apologize. When sandwich files came to NECA in 2007 before signing the lease, NECA warned sandwich files that the costs and capacity of the cable appear excessive. It also warned about the—it raised concerns about the affiliate transactions. This is an important point. Paniolo was built by another company. Yes. Not sandwich files. Yes. The Paniolo cable was built by a company. There's a disturbing interrelationship, but nevertheless, it's a separate company. And the FCC is not approving—didn't have Paniolo before it at any time. It only had sandwich files. That's correct. Paniolo came on the scene in 2007. No, my point is— A separate company. And Paniolo never appeared before the FCC, did it? That's correct. That's right. It's a separate company altogether. They put its own money into this deal on the compromise, I assume. Yes. That is correct. Paniolo's— Well, did it do it because it had an agreement with—I mean, it's a question of whether it was agreeing to do the building at sandwich files' behest. If those two had—I mean, imagine a scenario in 2000 where sandwich files said—and we just—it seems like we don't quite know—goes to the association and says, we've got to build this network, including the submarine cable, and it's going to cost XX million, double digits, maybe not the exact right price. And the association blesses it in a letter. And the sandwich files goes and finds a contractor to build this thing. And they have a long term—it takes a while to get the negotiations to get the thing going. But it's being built by another company.  Somebody— It's not a contract. But they have a contract with somebody to build it. Correct. Right. Sandwich files isn't going to build it itself. And then 2005, they've got their view. I guess there's different readings of their view, and they think they're still getting another nod now from the commission to make capital investments. And then by the time, you know, 2007, they go, okay, here's the bill. Or here's what we think the bill's going to be. We've been doing what you all said was okay. And of course, we told you it was going to be expensive. Here's the bill. And that's when everyone goes, oh my gosh, way too much. So the fact that it's another company doesn't really matter so much. The question is whether sandwich files was reasonable to get into that relationship and have that obligation to have infrastructure built for its service. A couple points in response to that. Through the used and useful lens, I mean. Yes. A couple points in response. I think that, first, as a matter of chronology, sandwich files lost funding to build the Paniolo Cable, to build what ultimately became the Paniolo Cable in 2004. We have to be very, very careful about this. My understanding is sandwich files built nothing. Paniolo, a separate company, built the cable. Paniolo was never in front of the FCC. Am I not correct? Yes, that is technically correct, yes. They were building it for sandwich files. Or anybody. Anybody could use that cable, right? My telephone could use that cable, right? In principle, yes, except that sandwich files in 2007, despite warnings from NECA that it might not be able to recover all of the costs of the cable through the NECA pooling arrangement, entered an exclusive lease. Why do you keep talking about it recovering the costs of the cable? You're assuming you're making the same mistake that the other side makes, which you try to distinguish in your brief. Paniolo is not before the FCC. Sandwich Aisle didn't build the cable. That's correct, but Sandwich Aisle is now seeking to recover its lease costs on the cable. Ah, its lease costs, that's right. Not the construction costs, its lease costs. Yes. And because Sandwich Aisle has entered an exclusive lease for the cable's entire capacity... When did they do... This is part of my who knew what when. Do we know when they agreed to do... Was it 2007 that they agreed to enter into that exclusive lease for this massive cable? Yes, I think that's a key point. In 2007, they've lined up the financing from Deutsche Bank. They've approached NECA. NECA has warned them that the costs might not all be recoverable through the pool because the costs and capacity seem so excessive. Wait a minute, you keep saying they. Sorry, NECA has warned Sandwich Aisle... I don't know... Sandwich Aisle did not get a loan from Deutsche Bank. Right. Paniolo got a loan from Deutsche Bank. Allow me to clarify. Keep that clear in your mind, counsel. Yes, Judge. Sandwich Aisle, in 2007, approaches NECA and says, we plan to lease the cable's entire capacity from Paniolo. NECA warned Sandwich Aisle that the costs and capacity of the cable, the costs and capacity of the lease, I should say, appear excessive given Sandwich Aisle's very small customer base. And this occurs... This is laid out, I believe, in JA 98-99. It occurs in the May-June 2007 timeframe. In July of 2007, despite those warnings, Sandwich Aisle enters the lease with... enters an exclusive lease with Paniolo for the cable's entire capacity despite the fact that the cable's entire capacity appeared to be roughly 200 times what Sandwich Aisle required. And up until that moment in time, was Sandwich Aisle still using... When it had some prior cable, it was...capacity was leasing. Was it still doing it up until that moment in time? Yes. Up until that time, Sandwich Aisle had been leasing capacity from Hawaiian Telecom. And crucially, the Commission found, and Sandwich Aisle doesn't meaningfully challenge, that it could have continued to do so to this date and adequately serve the needs of both its current and future customers. And so the Commission found that there was no need in the first place, effectively, to build this cable. To build the cable or to lease the entire cable? Well, to lease the cable. To lease the cable. Sandwich Aisle could have continued to serve its rate payers adequately by leasing capacity from unaffiliated third parties. Right. And the confusion here on building and leasing might be because of the...at least some evidence about the unusual relationship. Yes. That accounts for the slipping between the terms. But it's correct. It is a putatively different company. Let's imagine in 2007 when they came and said, we're still on our old lease, but here's the new lease we'd like to sign on X date in 2007 or 2008. And it's a $24 million lease. And if at that time the Association had said no, 24 hours later they'd appealed, and within a week or so the Commission said, are you nuts? There's no way we're going to approve that. Sandwich Aisle wouldn't have been out any money. It would have just done its old lease. Or we know that it wouldn't have lost investment money in this. I apologize. I haven't answered the question. I think it's a judgment. Sandwich Aisle didn't invest in anything? That's what I'm asking my question about. No, Panayola did. I'm asking whether they would have lost any money. Is the only money outlay in 2007 prospective lease expenses? My understanding is that in 2007 they did not have a lease commitment to Panayola. And that Sandwich Aisle – The $24 million was what they were going to incur starting that lease going forward. The question was whether they were going to enter this 20-year lease for the Panayola Company. That's all. The $24.1 million or something was the lease expense going forward. Yes, that's correct. I think the point is that because this cable was never necessary to serve Sandwich Aisle's rate payers, this is exactly the sort of gold plating that the used and useful standard is meant to prevent. And the used and useful standard requires that Sandwich Aisle show that the costs it's recovering on an ongoing basis are benefiting rate payers. When is the first time that AT&T complained to the FCC? AT&T, I believe, participated, submitted comments in response to Sandwich Aisle's petition for a declaratory ruling asking the FCC to override NECA's determination that these costs shouldn't be included in the pool. I'm asking for the date. The precise date? I don't know the precise date, but it was in conjunction with Sandwich Aisle's petition. What year? It was in 2009 or 10. Not in 2007? No, because what happened was in 2007, when Sandwich Aisle approached NECA in 2007 about entering this lease, NECA warned it that it might not be able to recover the costs. Sandwich Aisle went ahead, entered the lease. Over the next two years, Sandwich Aisle and NECA went back and forth with each other over the degree to which these costs should be allowed to be included in the pooling. Finally, in 2009, around June, NECA issued a definitive determination that costs beyond what Sandwich Aisle was previously paying Hawaiian Telecom, plus an allowance for growth, would not be allowed into NECA pooling. At that point, Sandwich Aisle's petition... So it's a declaratory ruling? Exactly. It's not a declaratory ruling. And the date is, that's 2010? That is in 2009, I believe, that they seeked a declaratory ruling. But that was a 50-50 ruling, wasn't it? That led to the 50-50 ruling by the Bureau, correct. And you objected to the 50-50 ruling before the Commission? Yes. After the Bureau issued the 50-50 ruling, AT&T filed an application for review. What date was that? That was in 2010. The Bureau ruling was in September of 2010, I believe, so it was late 2010. And can you have any explanation as a keen observer on this, why the FCC sat on this case for six years? I can't speculate as to why the FCC sat on the case for so long. No, no, I don't want you to speculate. You don't have any knowledge. I'm afraid I don't, but I think I would echo my colleague's point that to the extent there was delay in this case, it inured to Sandwich Aisle's benefit. Well, imagine it being a problem for others, though, going forward. Yes, Your Honor. Do we know if their lease, if not, I'll ask your friend on the other side, but was Sandwich Aisle's lease with Panteola and Cable with that full capacity a year-by-year lease, or was it for a set term of years? It was a 20-year lease, the price of which escalated over time until it reached a certain cap, and then it leveled off. A 20-year lease as usual? Is that usually how it's done? I'm not sure, Your Honor. Okay. If the Court has no further questions, we'd ask that you deny Sandwich Aisle's petition. Thank you very much. Which time does Mr. Smith have? Okay. Can we give you two minutes? Thank you. I didn't realize the yellow light meant I was done. The design of the network, including the undersea cable, was done in the late 90s. It was approved by the RUS, and the entire design of the network, as approved, was before the Commission when it issued its 2005 order. The Commission knew it would be expensive. The 2005 order contemplates $14,000 per loop per year in cost. You can find that at Joint Appendix 37 and 38, footnote 53. They knew it would serve relatively few customers. There was a change between 2005 and 2016 that can only be explained by the fact that it was arbitrary and capricious. The focus on 2007, as though somebody walked in and shocked and surprised NECA with the plan to build this cable, is simply a deception. It's not true. It was on the boards for a long time. It was opposed at every step by the big telecoms, Hawaiian Tel, Verizon, et cetera. Their position has not changed. From the outset, they said it was too expensive, it was unnecessary, et cetera, and they've been very consistent. The only party that's changed is the FCC. No facts have changed. The FCC changed for no reason, and they're going to drive my client out of business with this decision. Who is your client? My client, Sandwich Isles Communications. Not Paniolo? Not Paniolo. And Paniolo's the one with the capital investment? Paniolo's the one that borrowed the money. But Paniolo's the one with the capital investment. Yes, the arrangement— And they're not in front of us. I'll just explain. The arrangement was Sandwich Isles entered a lease for the full capacity of cable, and Paniolo doesn't even have a bank account. Paniolo's only account is in Deutsche Bank, so that when the rent goes to Paniolo, it goes straight to Deutsche Bank.  But that is the arrangement. Absolutely correct, Your Honor. Sandwich Isles is locked into a 20-year lease. Which it can't pay. Well, that seems a little inconsistent with your position for the commission, that actually it's not locked into a 20-year lease of $24.1 million, but actually we can knock it down to $8.1 million. So maybe you weren't so locked in at all. They were totally renegotiated. Well— Maybe they could renegotiate some more. How are we supposed to know, you know, how locked in or how reliable you were? Understood, Your Honor. Keep in mind that Deutsche Bank was recognizing the same reality we were, that we weren't going to get the $24 million. So they were kind of flexible about what they would be willing to do, too. Okay. But there isn't any margin for anybody between the rent—for anybody except Deutsche Bank. The full amount of the rent to Paniolo goes straight to Deutsche Bank. That was the point I wanted to make sure you understood. Thank you very much. Thank you. The case is submitted.
judges: Millett, Katsas, Silberman